# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Geraldine Soat Brown | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 0015 | **DATE** | 7/9/2002 |
| **CASE TITLE** | Noyd vs. Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  For the reasons set out in the Memorandum Opinion and Order, the defendant;'s motion for summary judgment [26-1] is denied; the plaintiff's motion for summary judgment [18-1] is granted, and the case is remanded to the Commissioner for proceedings consistent with the Memorandum Opinion and Order.

*Geraldine Soat Brown*

(11) ■ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

number of notices

JUL 1 2 2002
date docketed

docketing deputy initials

7/9/2002
date mailed notice

**Document Number**

**29**

tw
courtroom deputy's initials

U.S. DISTRICT COURT
CLERK
02 JUL 10 PM 2: 31

Date/time received in Central Clerk's Office

mailing deputy initials

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DONALD NOYD,
      Plaintiff,

      v.

JO ANNE BARNHART[1],
      Defendant.

)
)
)
)
)
)
)
)
)
)

Cause No. 01 C 15

Magistrate Judge Geraldine Soat Brown

## MEMORANDUM OPINION AND ORDER

Plaintiff Donald Noyd brings this action pursuant to 42 U.S.C. § 405(g) challenging the decision of the Commissioner of the Social Security Administration ("SSA") denying Plaintiff's request for Social Security Disability Benefits ("SSDB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 423 *et seq.* and 1381 *et seq.*[2] The Commissioner denied plaintiff's application for disability benefits initially (R. 28-31,

DOCKETED

JUL 1 2 2002

---

[1] The defendant in this case was listed previously as Larry G. Massanari, Acting Commissioner of the Social Security Administration. On November 9, 2001, Jo Anne B. Barnhart became the Commissioner of Social Security. Accordingly, pursuant to Fed. R. Civ. P. 25(d)(1) and 42 U.S.C. § 405(g), Jo Anne B. Barnhart is substituted for Larry G. Massanari as the defendant in this suit.

[2] The statutes and regulations for SSDB and SSI are essentially identical on issues relating to determination of disability. *See Ostrowski v. Heckler,* 609 F.Supp. 1109, 1112-13, n.1 (N.D. Ill. 1985) (Aspen, J.) ("Both disability programs, SSI and SSDI, establish the same legal standard for disability.") (citing 42 U.S.C. § 423(d)(1)(A) (SSDI) and 42 U.S.C. § 1382c(a)(3)(A) (SSI)). Accordingly, this Memorandum Opinion will cite only the section number of the statute or regulation pertaining to SSDB.



221-224), and upon review. (R. 34-36, 226-227).[3] Plaintiff requested and received a hearing before an administrative law judge ("ALJ"), who subsequently affirmed the denial of benefits. (R. 10-20.) The Appeals Council of the SSA's Office of Hearings and Appeals denied Plaintiff's request for review of the ALJ's decision (R. 5-6) and Plaintiff timely filed the present action. [Dkt # 1.] The parties now have filed cross-motions for summary judgment under Fed. R. Civ. P. 56 [Dkt # 18, 26], and have consented to the jurisdiction of a magistrate judge under 28 U.S.C. 636(c). [Dkt # 12, 13.] Thus, the decision of this Court constitutes the final ruling on the motions. For the reasons set forth herein, Defendant's motion for summary judgment is DENIED, Plaintiff's motion for summary judgment is GRANTED. Plaintiff's request for remand is GRANTED and the case is REMANDED to the Commissioner for further proceedings consistent with this opinion and order.

## BACKGROUND

1. Plaintiff's Injury and Medical Treatment History.

Plaintiff Donald Noyd injured his left hand in a work-related accident in August 1993, when he was 27 years old. (R. 39, 127, 261.) Plaintiff was employed through a temporary services firm, Kelly Services, at Frederick Bindery, a factory in Joliet, Illinois. (R. 247-48.) He was loading 60-100 pound bundles of vinyl sheeting into a machine to be cut to size for checkbook covers when he "felt something go pop" in his left hand. (R. 54, 58, 261.) Plaintiff is right-handed. (R. 296.) His physician, Vijay Kumar, M.D., performed out-patient surgery September 30, 1993, to remove a ganglion cyst on the tendon sheath of Plaintiff's left third finger. (R. 69.) Plaintiff underwent

---

[3] "R.___" refers to the certified record of proceedings, evidentiary documents, and administrative hearing transcript prepared by the Social Security Administration's Office of Hearings and Appeals pursuant to 42 U.S.C. § 405(g).

physical therapy following this surgery, and on October 25, 1993, Dr. Kumar cleared Plaintiff to resume work, restricting Plaintiff to light duty, lifting no more than 40 pounds. (R. 126.)

Plaintiff returned to Dr. Kumar on November 4, 1993, complaining of burning pain in his forearm that came when he was lifting "quite a lot of weight which was cold, frozen things." (R. 126.) Dr. Kumar found no sign of tenderness or other indications of complications from the surgery. He prescribed a course of pain clinic therapy and discontinued the post-surgery prescription pain medication Tordanol, instructing Plaintiff to resume his regular pain medications, which were Tylenol and Loricet. (R. 126.) In December, 1993, Plaintiff reported he was working only two days a week, but did not know whether this was because of lack of work generally or his employer's reluctance to return plaintiff to full-time work. (R. 126.) He complained of some pain in his left forearm and biceps/triceps area. (R. 126.) Dr. Kumar gave Plaintiff a certificate that he could do regular work five days a week. (*Id.*)

At a follow-up appointment a month later Dr. Kumar noted that Plaintiff still complained of tingling in his forearm and the upper portion of his hand that would be present when Plaintiff awoke but would work itself out during the course of the day. The areas of pain were less tender than previously, and Plaintiff had recovered strength in his hand and arm. (R. 125.) Plaintiff reported that he was not working his regular job, but instead was working odd jobs. Dr. Kumar advised Plaintiff to try to do his regular job as much as possible. (*Id.*)

In April, 1994, Plaintiff returned to Dr. Kumar. (R. 125.) Plaintiff reported he still was working odd jobs and his hand continued to bother him, although Dr. Kumar concluded the hand was "doing well." (*Id.*) Plaintiff also complained of pain and tenderness in the triceps area of his left arm. Dr. Kumar referred Plaintiff to an orthopaedist for a consulting opinion about the triceps

problem. (*Id.*) Dr. Kumar later reported Plaintiff was seen by a consulting orthopaedist, Dr. Tsai, who considered Plaintiff might need a "nerve exploration" (*i.e., further surgery*). (R. 124.) Plaintiff again returned to Dr. Kumar in August 1994, still complaining of pain in his upper arm and hand. (*Id.*) Plaintiff reported he had undergone therapy at the pain clinic of Silver Cross Hospital in Joliet, Illinois, headed by Daniel W. Gorski, M.D. (*Id.*)

Dr. Kumar referred Plaintiff to another orthopaedic specialist, Terry R. Light, M.D., at Loyola University Medical Center in Maywood, Illinois, who examined Plaintiff in October, 1994. (R. 90, 124.) Dr. Light reported Plaintiff was experiencing an "unusual pattern" of burning pain in his forearm that occurred whenever Plaintiff tried to use his arm with any vigor. (R. 90.) Dr. Light considered that surgery might be necessary on the forearm. Dr. Light issued a release for Plaintiff to return to work, but restricted him to work with his right hand only. (R. 90.) In November 1994 Plaintiff underwent his second surgery, a tenolysis of muscles and tendons of the forearm and hand and resection of a ligament in the hand. (R. 75.) Dr. Light, who performed the surgery, anticipated that this procedure might not completely relieve the arm pain, and might prove of no benefit at all to alleviate the pain Plaintiff experienced in his hand and wrist. (R. 89.) Dr. Light considered Plaintiff was capable of work activity using only his right hand, with only occasional use of the left hand for simple lifting activities, though not repetitious movement and no heavy lifting. (*Id.*)

Plaintiff underwent therapy in December, 1994 and January, 1995, before Dr. Light determined Plaintiff could return to work in February, 1995, with continued therapy once or twice a week after work. (R. 84.) In March, 1995, Dr. Light noted Plaintiff's strength continued to improve, but that Plaintiff could benefit from work-hardening therapy. Dr. Light noted Plaintiff had not yet returned to work, apparently because no work was available. (R. 83.) Plaintiff's workers

4

compensation insurance carrier initially refused to authorize payment for work-hardening therapy, but Plaintiff continued the original post-operative physical therapy until June 1995. (R. 82.) At the conclusion of that physical therapy program Plaintiff underwent a work evaluation, after which Dr. Light determined Plaintiff could do light work, including infrequent lifting of up to twenty pounds and frequent lifting of up to ten pounds using his upper left arm as an assist, but no one-handed lifting using the left arm. (R. 79.)

Near the end of July, 1995, Plaintiff still had not returned to work, and Dr. Light noted that Plaintiff was not following through on recommended home exercise to strengthen his left hand and arm. (R. 78.) Dr. Light concluded Plaintiff had reached "maximal medical improvement," and he discharged Plaintiff from further care. (*Id.*) Dr. Light determined that the residual pain in Plaintiff's left arm was permanent, but that Plaintiff could do work activity including infrequent lifting of up to 50 pounds and frequent lifting up to 25 pounds, but with no one-handed lifting using the left arm. (*Id.*)

Five months after Dr. Light discharged him, Plaintiff returned to Dr. Kumar, in December, 1995. Dr. Kumar reported Plaintiff had undergone work-hardening therapy and could lift twenty pounds with his left hand, but that the area of the surgical scar was sensitive. (R. 124.) Dr. Kumar prescribed desensitization therapy. (*Id.*) By February, 1996, Dr. Kumar reported Plaintiff showed only partial improvement, and was experiencing what felt like an electric shock going through the nerves of his hand and arm when he touched the surgical scar. Dr. Kumar suspected there might be some form of neuroma resulting from the surgical scar pressing on a nerve. (*Id.*) In April, 1996, Dr. Kumar performed a third surgery in the area of the scar tissue to deal with the possible neuroma. (*Id.*) Following this surgery Plaintiff resumed desensitization and grip strength therapy and showed

some improvement. (R. 123.)

In July, 1996, Dr. Kumar approved Plaintiff's return to work, limited to light work initially. (R. 123.) In August, 1996, Dr. Kumar reported Plaintiff had worked approximately one week at a job lifting about 25 pounds, but was laid off. Plaintiff reported experiencing swelling of his hand and arm in the region of the surgical scar, for which Dr. Kumar prescribed a "pressure garment" for the wrist and forearm and directed Plaintiff to continue physical therapy for two more weeks. (R. 123.) After two weeks of further therapy Plaintiff still reported some pain and swelling, but the therapist working with Plaintiff at Midwest Hand Care in Joliet, Illinois said Plaintiff had "reached a plateau in therapy" and was discharged. (R. 164.) Dr. Kumar told Plaintiff to discontinue formal therapy and just perform the therapeutic exercises on his own at home. (R. 122.) The following month, September, 1996, Plaintiff continued to report swelling and sensitivity in the area of the surgical scar, and Dr. Kumar prescribed further pain therapy through Dr. Gorski. (R. 123.) Also at about this time, in August and September, 1996, Plaintiff underwent psychological and physical evaluations by the Illinois Department of Rehabilitation Services ("DORS") to determine his suitability for vocational retraining.[4] (R. 192-96.)

---

[4] Plaintiff's work history prior to his injury, in addition to the job at Frederick Bindery, included primarily jobs involving a substantial amount of lifting. He worked for an industrial laundry, loading and unloading trucks and as a route driver (R. 251), where the loads he lifted sometimes were over 100 pounds. (R. 252.) Prior to the laundry job he worked in a factory that built cabinets, where he operated a ripsaw and lifted sheets of plywood weighing 75 pounds. (R. 255-56.) Other jobs included work on the assembly line at a rail car manufacturing plant, building rail freight car suspensions that required lifting parts weighing 75 to 110 pounds (R. 253-55), and work at an electronics store that included unloading semi trucks and bringing merchandise down from a stock room on the top floor of the store and carrying it to the customer's car. (R. 258-59.) The cabinet-making job ended when the company went out of business (R. 255); the rail car manufacturing job ended when the company finished the project (R. 253); the laundry job ended when the company was sold and Plaintiff's position was eliminated. (R. 253.) After his injury Plaintiff worked at three or four jobs secured through Kelly Services. (R. 247.) None of these jobs

In November, 1996, Dr. Gorski at Silver Cross Hospital pain clinic commenced a series of steroid injections of the scar tissue area, in addition to physical therapy, massage therapy, ultrasound, and other procedures performed by therapists at Midwest Hand Care. (R. 96, 154.) Plaintiff received four steroid injections between November and December 1996. (R. 97, 204, 207, 210.) In early January 1997 Plaintiff returned to Dr. Kumar who noted the injections were causing "denting" of the tissue at the site of the injections, and recommended that Plaintiff discontinue the injections to avoid problems with atrophy of the scar tissue and increased tenderness. (R. 122.) Dr. Kumar also reported Plaintiff "still has a painful tendon synovial cyst" in the third finger of his left hand. (*Id.*) Plaintiff informed Dr. Kumar at this January, 1997 visit that Plaintiff was to undergo vocational retraining through a State of Illinois-funded program. (*Id.*) Dr. Gorski administered a fifth steroid injection in January, 1997, shortly after Dr. Kumar recommended Plaintiff discontinue these injections. (R. 201.)

Following his January, 1997 appointments with Dr. Kumar and Dr. Gorski, Plaintiff underwent an evaluation by yet another consulting physician, Robert R. Schenck, M.D., whose specialty was hand surgery. (R. 132-33.) This evaluation was made in late January, 1997, at the request of the workers compensation insurance carrier. Dr. Schenck reported that Plaintiff's complaints centered around a tender mass that could be felt at the base of the middle finger of Plaintiff's left hand. (R. 132.) Dr. Schenck stated Plaintiff told him Dr. Kumar was contemplating another surgery to excise this cyst, as well as further exploratory surgery to determine if a neuroma had developed in this area of Plaintiff's hand. (*Id.*) Dr. Schenck recommended "no further surgery

---

lasted more than one week (R. 247), and they ended because of Plaintiff's inability to perform the job due to his injury. (R. 244-47.)

on this gentleman under any circumstances, as it would not hasten his return to work." Instead of surgery, Dr. Schenck recommended the cyst be injected with Celestone (a steroid) to decrease the tenderness. Dr. Schenck stated: "The small mass should not be symptomatic. I would then recommend that [Plaintiff] return to his regular work duties approximately one week after such injection." (R. 133.)

In February, 1997, Plaintiff returned to Dr. Kumar, accompanied by "his therapist from the insurance company." (R. 122.) Plaintiff now was in the DORS vocational retraining program. In the meantime, Dr. Kumar prescribed continued physical therapy for the next eight weeks, and cleared Plaintiff for light duty work with a restriction on repetitious movements or lifting more than 15 pounds with the left hand. (R. 122.) Later that month Dr. Kumar administered a steroid injection into the cyst on Plaintiff's finger (R. 122), noting he administered this injection at the suggestion of Dr. Schenck (R. 121). At a follow-up visit in March 1997, however, Plaintiff reported no lessening of pain in his finger or forearm, and Dr. Kumar concluded Plaintiff had "plateaued." (R. 122.)

Dr. Kumar saw Plaintiff again in April, 1997, and reported Plaintiff still was experiencing pain in his finger whenever he tried to grip something, as well as pain in his forearm in the area of the surgical scar, which Dr. Kumar noted had atrophied following the steroid injections at the pain clinic. (R. 121.) Dr. Kumar also noted Plaintiff had been discontinued from regular therapy. Dr. Kumar sent Plaintiff back to Dr. Light at Loyola Medical Center to evaluate whether further surgery would be helpful for the finger and forearm pain. (R. 121.)[5] Dr. Light examined Plaintiff in late

---

[5] Plaintiff testified at the administrative hearing that Dr. Kumar referred Plaintiff back to Dr. Light to obtain a second opinion prior to performing the April 1996 surgery (Plaintiff's third surgery, and the second performed by Dr. Kumar). (R. 267.) Both Dr. Kumar's and Dr. Light's records show that referral occurring a year later, in April 1997. (R. 267.) Plaintiff testified that the referral was requested by the workers compensation insurance carrier to obtain a second opinion on the need for

April, 1997 and concluded: "I do not feel his pain is specifically related to the mass in the finger and feel it is unlikely that further surgical intervention will in any way change his condition. I would not recommend additional surgery at this time." (R. 131.)

## 2. Post-Injury Work Attempt.

At about the same time, in April, 1997, Plaintiff obtained a job through Kelly Services as a sales trainee in the automotive department of a Montgomery Wards store. (R. 54, 59, 245.)[6] Plaintiff started this job on April 13, 1997. (R. 54.) The work involved both floor sales and work stacking batteries and tires. (R. 243.) However, after just two weeks Plaintiff was terminated from this job on April 26, 1997. (R. 54.) Plaintiff testified at the administrative hearing that he experienced "excruciating pain" in his left arm, causing him to miss work. (R. 244.) He testified he then went back to Dr. Kumar, who purportedly "told me that I just can't do that kind of work any

---

this surgery, and that Dr. Light "gave the go ahead" for Dr. Kumar to perform the surgery. (R. 267.) Dr. Kumar's records contain no report of this 1996 referral. However, Dr. Schenck's January, 1997 report to the insurance carrier notes Dr. Schenck also evaluated Plaintiff in June 1996. (R. 132.)

Plaintiff testified that the next time he saw Dr. Light was just a few days prior to the October, 1998 administrative hearing, not in April or May, 1997 as indicated by Dr. Kumar's records. (R. 267.) Plaintiff testified Dr. Kumar referred Plaintiff to Dr. Light at this time because Plaintiff continued to experience pain even though he was taking Tylenol with codeine that Dr. Kumar prescribed (in August 1998). (R. 267-68.) Plaintiff said Dr. Light told Plaintiff, "I'm stuck with the pain. There's nothing that he can do for me." (R. 268.)

There is no record of this October, 1998 referral in Dr. Kumar's records, which counsel for Plaintiff requested from Dr. Kumar by mail dated October 13, 1998 (R. 120), the day before the administrative hearing (and some days after Plaintiff's visit to Dr. Light), and produced to the ALJ after the hearing, on November 16, 1998. (R. 119.) Nor did plaintiff's counsel provide any record from Dr. Light regarding that referral.

[6] There is some inconsistency in the record regarding the dates Plaintiff worked at Montgomery Wards. Plaintiff indicated on his application for disability benefits that he worked at Montgomery Wards from April 13 to April 26, 1997. (R. 54.) However, Dr. Kumar reported in notes of a December 1997 treatment session that Plaintiff told Dr. Kumar he worked for Montgomery Wards in June 1997, not April. (R. 121.) Plaintiff also testified at the October 14, 1998 administrative hearing that he held this job in "May or June" of 1997. (R. 242.)

more." Plaintiff testified Montgomery Wards "finally let me go." (*Id.*)

Dr. Kumar's report of this job differs somewhat from Plaintiff's. Dr. Kumar's records show that in December, 1997, Plaintiff told him the Montgomery Wards job was in June 1997, not April 1997. (R. 121.) In addition, Dr. Kumar reports Plaintiff told Dr. Kumar that he "started dropping things" and could not do the work "after four weeks." (*Id.*)

In early May, 1997, Plaintiff underwent a hand strength and dexterity evaluation under the auspices of Hand Surgery, Ltd., which was Dr. Schenck's office. (R. 128-30.) The record of this evaluation consists only of data of test results as reported by a therapist (R. 129-30), and a "Work Status Statement" signed by Dr. Schenck that states only that Plaintiff can return to his regular duties on May 5, 1997, and is discharged from further treatment by Hand Surgery, Ltd. (R. 128). On May 6, 1997, Plaintiff had a follow-up visit with Dr. Kumar. Dr. Kumar recommended Plaintiff continue his vocational rehabilitation training and "try regular duty as tolerated." Dr. Kumar prescribed "extra-strength Tylenol" for pain relief. (R. 121.)

In May, 1997, Plaintiff, who at the time had completed school only through the ninth grade, also took the General Educational Development ("GED") Test for a high school equivalency diploma. (R. 191, 236-37.) He passed all portions of the examination except the test for writing skills. (R. 191.)

Plaintiff returned to Dr. Kumar in July, 1997, who reported that Plaintiff was "about the same." (R. 121.) Dr. Kumar noted Plaintiff was continuing his vocational rehabilitation and had discontinued physical therapy. Dr. Kumar advised Plaintiff to "[d]o as much as possible" and "come back as needed." (*Id.*)

Plaintiff's next reported session with Dr. Kumar did not take place until almost six months

later, in mid-December, 1997. (R. 121.) In addition to reporting his brief work attempt at Montgomery Wards, Plaintiff also informed Dr. Kumar that Plaintiff now was "in school full time," and "doesn't have to do any work with the hand." (*Id.*) However, Plaintiff reported that his left hand still hurt, was tender, and would swell up even when Plaintiff did not work. (*Id.*) Dr. Kumar reported the hand "looks better," and circulation "looks good," but found the surgical scar site still tender. (*Id.*) Dr. Kumar directed Plaintiff to continue with deep exercising and desensitizing, and come back in three months or sooner if there were any problems. (*Id.*)

### 3. Agency Investigation of Plaintiff's Disability Claim.

Shortly after this appointment with Dr. Kumar, Plaintiff contacted the Social Security Administration on December 19, 1997, to apply for disability benefits. (R. 38.) In an activity report dated January 9, 1998, Plaintiff noted that he attended school five days a week. (R. 50.) He reported no problem concentrating or thinking, no problem completing tasks, and no periods of forgetfulness. (*Id.*) He reported that he could not lift or use his left arm for any length of time, and stated that he did no household chores, no shopping, and rarely or never drove a car, fixed things, played cards or games, or pursued hobbies or volunteer activities, all due to conditions of pain and swelling in his arm. (R. 52.) He reported taking only aspirin for his problems with his arm and hand. (R. 50.)

In March, 1998, Plaintiff underwent an examination by Yatin M. Shah, M.D., who evaluated Plaintiff at the request of the Illinois Bureau of Disability Determination Services, which SSA utilized to investigate Plaintiff's claim. (R. 100-102.) Dr. Shah summarized Plaintiff's injury and treatment history, and reported that Plaintiff showed moderately decreased grip strength in the left hand (rated three on a scale of five), and decreased range of motion in the left wrist to 60 degrees. (R. 101.) Dr. Shah characterized Plaintiff's condition as "chronic pain with the left upper extremity,

11

due to multiple surgeries done in the past." (R. 102.) He reported Plaintiff took aspirin for pain, and had difficulty using his left hand to hold things, turn a doorknob, or button his shirt (R. 100), but that Plaintiff was right-handed and could manage these manipulations with his dominant hand. (R. 102).

An assessment of Plaintiff's residual physical functional capacity prepared by the Illinois agency based on Dr. Shah's evaluation concluded that Plaintiff had reduced grip strength and limited gross and fine manipulation in his left hand (R. 106), but no other physical limitations, and that Plaintiff should be able to lift up to 50 pounds occasionally and 25 pounds frequently. (R. 104).

### 4. Plaintiff's Return to School.

The full-time school program Plaintiff reported to Dr. Kumar was part of the vocational retraining plan Plaintiff became involved in through DORS. (R. 238.) In August, 1997, Plaintiff entered an associate degree program in computer science at Joliet Junior College. (R. 237.) The school made special accommodations for students with disabilities. (R. 238.) Plaintiff was classified as one of these "special needs" students. He attended classes with the general student population. (R. 242.) However, he was allowed to leave the classroom as needed if the pain and swelling symptoms in his hand became too severe. The school designated a person to take lecture notes for Plaintiff while he was out of the classroom. (R. 238, 242.) The school also provided a personal counselor for special needs students. (R. 238.)

At the time of the administrative hearing in October, 1998, Plaintiff had completed two semesters of the four-semester associate degree program and was into his third semester. (R. 238-39.) He had achieved a 3.0 average (on a 4.0 scale) in his second semester and a 2.78 average for his first and second semesters combined. (R. 190.) He intended to retake the final portion of the GED exam after his third semester, to fulfill the requirement that he pass the GED exam before he

could be awarded the college degree. (R. 239.)

Plaintiff was classified as a full-time student by the college. (R. 241.) He completed 20 credit hours in his first year and at the time of the administrative hearing was enrolled in four courses totaling 14 credit hours. (R. 190, 241.) His third semester class schedule included four one-hour classes from eight to twelve o'clock on Monday, Wednesday, and Friday mornings, and two classes, from eight to nine and from ten to eleven o'clock on Tuesday and Thursday mornings. (R. 241.)

Plaintiff testified at the administrative hearing that the pain and swelling in his left hand required him to leave the classroom two or three times a day on better days, and four or five times a day on worse days. (R. 275.) According to his application for disability benefits, at the time he began his college program he was taking only aspirin–four a day–for pain, and icing his hand for swelling. (R. 48, 68.) Just before beginning his third semester of classes, in August,1998, Plaintiff returned to Dr. Kumar, complaining of pain and swelling in his hand. Dr. Kumar noted a "slight puffiness" of the hand on this occasion. (R. 121.) According to his records Dr. Kumar prescribed "Tylenol # 2" for relief of pain, with a non-refillable prescription of 20 pills.

At the administrative hearing Plaintiff referred to this as being a prescription for "Tylenol 4's with codeine." (R. 273.) He testified that the medication did help relieve his pain "[a] little bit." (R. 273.) However, he found that the medication made him drowsy and unable to concentrate at school. Accordingly, Plaintiff did not take this pain medication when he had classes (R. 273-74), but only would leave the classroom to run cold water over his hand and elevate the hand above his heart to reduce the swelling (R. 278), and "try to think of something else besides my pain." (R. 275).

5. Plaintiff's Status at Time of Administrative Hearing.

Plaintiff testified at the administrative hearing that he experienced "continuous pain 24 hours

13

a day." (R. 274.) On a scale of one to ten he rated the pain as "between five and six continuously." (R. 285.) He experienced swelling of the hand and wrist two or three times a day, and the swelling intensified the pain. (R. 274-76.) He testified that he limited his driving a car because "sometimes, if I get swelling, I got to pull over to the road [*sic*]. I just don't want to deal with the hassle of hurting myself or somebody else." (R. 285.) He said he drove himself to the administrative hearing, but his girlfriend usually would drive him to school. (R. 284.) He tried Dr. Kumar's recommendation of wearing "an icetoner glove" [presumably the glove brand-named "Isotoner"] to control the swelling, but found this provided no benefit and discontinued using the glove. (R. 277.) In the wintertime Plaintiff wore a metal brace given to him by Dr. Kumar to protect his wrist in the event he slipped and fell on ice or snow. (R. 282.) As for the prospects of future treatment, Plaintiff thought Dr. Kumar planned to refer Plaintiff to another doctor "to see what could be done" in the way of further treatment, but Plaintiff did not know yet what that would be. (R. 282.)

## 6. Vocational Expert Testimony.

The ALJ arranged for a vocational expert, William J. Schweihs, to attend the administrative hearing, review the evidence, hear plaintiff's testimony, and give his opinion on whether there were jobs Plaintiff could perform despite his impairment. (R. 115-18.)[7] The vocational expert

---

[7] As discussed further in the following section, the evidence of record at the time of the administrative hearing was not complete. The evidence was limited to Dr. Kumar's report on the initial surgery he performed in September 1993, Dr. Light's report relating to the November 1994 surgery and post-operative follow-up, the report of Dr. Shah's consultative examination for the SSA, and the SSA's own internal evaluation of Plaintiff's residual functional capacity. These were the medical records available for the vocational expert to review prior to rendering his opinion at the administrative hearing. Only after the administrative hearing did Plaintiff's counsel supplement the record with the bulk of evidence referenced in the background information cited in this opinion. The supplementation now in the record, almost 100 pages of documents, included Dr. Kumar's complete record of treatment notes, extensive daily progress reports from Midwest Hand Care on Plaintiff's

characterized Plaintiff's pre-injury employment as consisting of semi-skilled and skilled work involving medium and heavy levels of exertion. (R. 293-95.) He concluded that Plaintiff could not return to any of these jobs, given his hand impairment (R. 297), though Plaintiff did acquire transferable skills such as dealing with customers, sales training, working a delivery route, and understanding how to adjust and operate machinery at precise tolerances. (R. 295-96.)

The ALJ posed two hypotheticals and asked the vocational expert whether there would be any other jobs in the local or national economy that Plaintiff could perform. The first hypothetical asked the vocational expert to assume an individual of Plaintiff's age, education, and work experience; assume he was right-hand dominant; assume he frequently experienced decreased grip and decreased fine and gross dexterity with the left hand, and frequently experienced decreased range of motion in his left wrist; and assume the person should be in a work setting free of unprotected heights and dangerous machinery. (R. 297.) The vocational expert gave the opinion there would be a variety of positions such a person could handle, mostly requiring light exertion but possibly including some medium exertion. He cited as examples cashier work, information clerk, gate tending, security monitor, and receptionist, noting that these would be essentially unskilled levels of work. (R. 297-98.) The vocational expert gave statistics of three to five thousand such jobs existing in each category in the local economy, increased by a factor of 30 for the national economy. (R. 298.)

The second hypothetical posed by the ALJ asked the vocational expert to assume the factors

---

various courses of physical therapy, Dr. Gorski's pain clinic treatment records, information from DORS on Plaintiff's evaluation for vocational rehabilitation and his first-year grade report from Joliet Junior College, various reports of work evaluations made of Plaintiff over the years, and the consultative opinions issued at various times by Dr. Light and Dr. Schenck. (R. 120-215.)

of the first hypothetical, and add to those assumptions that the person experienced chronic, moderate pain that limited his ability to understand and carry out detailed instructions; assume the person frequently would be limited in the ability to maintain attention and concentration for extended periods; and assume the person frequently would be limited in the ability to perform at a consistent pace without an unreasonable number and length of breaks–above and beyond "the normal two breaks." (R. 299.) The vocational expert gave the opinion there would not be any jobs in the local, regional, or national economy that such a person could perform. The inability to maintain attention, concentrate, and perform at a consistent pace for extended periods would rule out unskilled jobs, and the inability to understand and carry out detailed instructions would eliminate anything requiring a higher level of skill. (R. 299-300.)

Plaintiff's counsel did not question the vocational expert further, but remarked to the ALJ, "I think your second hypothetical is more or less what I would have asked." (R. 300.)

## DISABILITY DETERMINATION PROCESS

The Social Security regulations ("Regulations") prescribe a sequential five-part test for determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520 (1999). The Commissioner must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the Regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *Id.*; *see also Young v. Secretary of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A finding of disability requires an affirmative answer at either step three or step five. A

negative answer at any step (other than step three) precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps one to four, after which the burden shifts to the Commissioner at step five. *Id.*

When a claimant for disability benefits cannot be found disabled based upon medical considerations alone, the Social Security Administration has established the Medical-Vocational Guidelines ("the Grid") in order to assess a claimant's ability to engage in substantial gainful activity.[8] *See* 20 C.F.R. Part 404, Subpart P, App. 2 (1999). The Commissioner's analysis at step five typically involves an evaluation of the claimant's residual functional capacity to perform a particular category of work (i.e. sedentary, light, medium, heavy, or very heavy work), in combination with an application of the Grid to determine whether an individual of the claimant's age, education, and work experience could engage in substantial gainful activity. 20 C.F.R. Part 404, Subpart P, App. 2.

If use of the Grid is appropriate, the Commissioner may rely upon it for determining disability, and the Grid alone suffices as substantial evidence to uphold the decision of the Commissioner. *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). However, the use of the Grid is inappropriate if the claimant suffers from severe non-exertional impairments that prevent the claimant from performing the work indicated by the Grid.[9] *Id.* at 640-41.[10]

---

[8] The Grid is a chart which classifies a claimant as disabled or not disabled, based on the claimant's physical capacity, age, education, and work experience. The Grid was promulgated to simplify the process and improve the consistency of disability determinations. These guidelines, however, are only to be applied when they accurately describe a claimant's abilities and limitations. *Heckler v. Campbell*, 461 U.S. 458, 462 n. 5 (1983). If a claimant's non-exertional limitations restrict the full range of employment opportunities at the level of work that he or she is capable of performing, use of the Grid is precluded. *Id.*

[9] A non-exertional limitation affects the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, or handle, and use of the fingers for fine

17

The determination as to whether use of the Grid is appropriate is a question of fact, and the Commissioner's decision to use the Grid will be upheld if substantial evidence supports its application. *Id.* at 641. "To uphold the ALJ's finding that the grids may be used in a given case, we require only that there be reliable evidence of some kind that would persuade a reasonable person that the limitations in question do not significantly diminish the employment opportunities otherwise available." *Walker*, 834 F.2d at 641 (7th Cir. 1986) (quoting *Warmoth v. Bowen*, 798 F.2d 1109, 1112).

When the Grid cannot be used to assess whether the claimant is capable of doing substantial gainful activity, other reasonable evidence must be relied upon to prove the claimant's employment opportunities are not significantly diminished. *Warmoth*, 789 F.2d at 1112. A vocational expert may be used by the Commissioner to assess whether there are a significant number of jobs in the national economy that the claimant can perform. *Id.*; 20 C.F.R. § 404.1566(e).

## ALJ's DECISION

The ALJ applied the five-step analysis to find Plaintiff not disabled. 20 C.F.R. § 404.1520. First, the ALJ concluded Plaintiff did not engage in any substantial gainful activity in the period following his September 1993 injury. (R. 14.) The ALJ regarded Plaintiff's job at Montgomery Wards in April 1997 as an unsuccessful work attempt. (R. 14.) Accordingly, Plaintiff met the step

activities. Such a limitation does not directly affect the ability to sit, stand, walk, lift, carry, push, or pull. An exertional activity is any of the primary strength activities like sitting, standing, walking, lifting, carrying, pushing, or pulling. Social Security Ruling No. 83-10; 1983 WL 31251, at * 2 (SSA 1983).

[10] The fact that a claimant suffers from a non-exertional impairment does not automatically preclude utilization of the Grid. It is only when the non-exertional impairments are severe enough so that use of the Grid is not appropriate that the court will reverse a determination of non-disability based on the Grid. *Walker*, 834 F.2d at 641.

one requirement of not having worked in the period since the onset of his claimed disability. Next, the ALJ determined that Plaintiff's limited ability to lift and carry constituted a "severe" impairment, and thus Plaintiff met the step two requirement. (R. 14.)

At step three, the ALJ concluded Plaintiff did not meet or equal any listed impairment. (R. 15.) The written decision issued by the ALJ notes that Plaintiff's left wrist impairment did not meet the criteria for level of severity and limitation of function set forth in "§ 1.09" of Appendix 1, Subpart P, Regulations No. 4. (R. 15.) This appears to have been a typographical error. The listing that pertains to loss of function of the wrist is Section 1.02(B) of Appendix 1. 20 C.F.R. Pt. 404, Subpt P, App. 1, § 1.02(B). However, Section 1.02(B) requires an "extreme loss of function" in a major weight-bearing joint (which includes the wrist) in *both* upper extremities. *Id.*, citing App. 1, § 1.00(B)(2)(c). Since Plaintiff complained only of loss of function in his left arm, he cannot meet the requirement for the listed impairment.

At step four, the ALJ determined that Plaintiff had the residual functional capacity to lift, carry, and push/pull up to 20 pounds occasionally and up to ten pounds frequently, but had to avoid repetitive use of the left arm. (R. 15.) Accordingly, the ALJ concluded that Plaintiff could not return to any past relevant work, which the ALJ characterized, based on the vocational expert's testimony, as having comprised semi-skilled jobs requiring medium to heavy levels of exertion. (R. 17.) However, the ALJ concluded that, apart from the weight and motion restrictions noted above, Plaintiff had "no other limitations, whether exertional or non-exertional." (R. 15, 18.)

As to the absence of any non-exertional impairment, the ALJ concluded that Plaintiff's "subjective complaints of functional limitations and allegations of pain are not fully credible, although his testimony at the hearing was generally credible." (R. 18.) The ALJ cited Social

Security Regulation ("SSR") 96-7p as the standard he applied in making this credibility determination. (R. 16.) The ALJ noted first that Plaintiff had been prescribed "Tylenol # 4 with codeine" to deal with his residual pain. (R. 16.) Second, the ALJ cited the fact that Plaintiff was attending college under DORS sponsorship, and was "doing well and should be able to obtain competitive employment when he finishes his Associate's Degree." (R. 16.)

Third, the ALJ cited the form filled out on Plaintiff's behalf when he first applied for disability benefits on which Plaintiff reported he performed no household maintenance, recreational activities or hobbies, or driving a vehicle. (R. 48.) The ALJ considered this a representation by Plaintiff that he was "incapable of performing any daily living tasks." (R. 16.) However, the ALJ noted that Plaintiff told Dr. Shah, the SSA-appointed consulting physician who examined Plaintiff in March, 1998, prior to the administrative hearing, that because he was right-handed Plaintiff had, as the ALJ characterized it, "no difficulty with activities of daily living, including turning the doorknob, putting his shirt on, and holding cups." (R. 16, 100.) The ALJ concluded that "[a]ny restrictions of other daily living activities cannot be objectively verified and claimant has not disclosed any." (R. 16.) Accordingly, the ALJ concluded that "claimant's impairment and allegations of pain are overstated although he was generally credible at the hearing." (R. 16.)

Although the ALJ discounted Plaintiff's credibility, the ALJ nevertheless refrained from applying the Grid to find Plaintiff not disabled. The ALJ noted that Plaintiff had the residual functional capacity to perform a wide range of light and sedentary work and therefore, considering Plaintiff's age, education, and work experience, the Grid would warrant a finding of "not disabled." (R. 19.) 20 C.F.R. Pt. 404, Subpt P, App. 2, § 202.18. However, the ALJ considered there were limitations on Plaintiff's ability to perform a *full* range of light and sedentary work. (R. 19.)

Accordingly, the ALJ used the Grid only as a framework for decision-making, and rested the ultimate decision on the testimony of the vocational expert.. (R. 19.)

The ALJ stated that he posed a hypothetical in which the vocational expert was asked to assume the existence of an "individual with claimant's characteristics and the residual functional capacity identified earlier in this decision." (R. 17.) The ALJ stated that the vocational expert's response to the hypothetical question was that "such an individual could perform jobs existing in significant numbers in the national economy." (R. 17.) The ALJ cited the vocational expert's examples of cashier, information clerk, gate security, security monitor, and reception, and noted these jobs all existed in significant numbers–3,000 to 5,000 in the regional economy and 90,000 to 150,000 in the national economy for each type of job. (R. 17, 19.) From this the ALJ concluded Plaintiff was not disabled "at any time through the date of this decision." (R. 19.)

As noted previously (in footnote 7), the record of medical evidence available at the hearing was incomplete. The ALJ allowed plaintiff's counsel additional time following the hearing to submit further evidence. (R. 300.) In response, Plaintiff submitted Exhibits 14F, 15F, 16F, 17F and 18F, consisting of almost 100 pages of documentation, including treatment notes from Dr. Kumar spanning five years from just after Plaintiff's initial surgery in September, 1993, until just prior to the October 1998 administrative hearing. (R. 119-31.) Plaintiff also submitted records for some of the physical therapy and work evaluations he underwent over the years, in particular the period since he underwent his third surgery in 1996. (R. 135-88.) Additional records covered Dr. Gorski's steroid injection treatments at the Silver Cross Hospital pain clinic (R. 200-10), consultative evaluations performed at various times by Dr. Light and Dr. Schenck (R. 128-37, 198), and the DORS records of physical and psychological evaluation and grades transcripts from Joliet Junior

21

College and the GED examination. (R. 190-97).

The ALJ's decision made no reference to any of these post-hearing submissions. His discussion of medical evidence referred to only two of the three surgeries Plaintiff underwent, the original surgery in September, 1993 and the April, 1996 neuroma surgery. The reference consisted only of naming the type of surgery, with no comment about the outcome, post-surgical therapy, or other reports. (R. 15.) There is no reference to Dr. Kumar, who performed these surgeries. Instead, the ALJ named Dr. Light as "the treating physician," yet made no mention of the surgery Dr. Light performed on Plaintiff's forearm in November, 1994. (R. 15.)

The ALJ's only additional references to the medical evidence were that Plaintiff underwent an electromyelogram (nerve conduction test) in September, 1994, reporting normal results; that Dr. Light released Plaintiff for work in March, 1995, and declared Plaintiff able to do light work in June, 1995; and that the consulting physician who examined Plaintiff at the request of the SSA, Dr. Shah, reported (as summarized by the ALJ) "3/5 grip strength in the left hand and limitation of motion in the left wrist at 60°" with a neurological examination that "failed to reveal any abnormalities anywhere including the left upper extremity." (R. 15-16.) In referring to Dr. Shah's report, the ALJ did not cite Dr. Shah's diagnostic impression that Plaintiff suffered "chronic pain with the left upper extremity, due to multiple surgeries done in the past." (R. 102.)

## STANDARD OF REVIEW

The Social Security Act provides for limited judicial review of a final decision of the Commissioner (effectively that of the ALJ where, as here, the Appeals Council has denied the applicant's request for review). Where the ALJ commits an error of law, "reversal is required without regard to the volume of the evidence in support of the factual findings." *Imani v. Heckler,*

797 F.2d 508, 510 (7th Cir. 1986). With respect to the ALJ's conclusions of fact, the reviewing court's role is limited. There the role of the district court is only to determine whether the decision of the ALJ is supported by substantial evidence in the record. *Wolfe v. Shalala*, 997 F.2d 321, 322 (7th Cir. 1993). In reviewing the Commissioner's decision, the court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *Brown v. Chater*, 913 F. Supp. 1210, 1213-14 (N.D. Ill. 1996)(Bucklo, J.). Thus, this court does "not substitute [its] own judgment for that of the ALJ." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997). Rather, the court must affirm a decision supported by substantial evidence in the absence of an error of law. *Herr v. Sullivan*, 912 F.2d 178, 180 (7th Cir. 1990); *Edwards v. Sullivan*, 985 F.2d 334, 336-37 (7th Cir. 1993). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

### THE COMMISSIONER'S ROLE

When evaluating a disability claim the Commissioner (*i.e.,* the ALJ) must consider all relevant evidence and may not select and discuss only that evidence that favors his ultimate conclusion. *Herron*, 19 F.3d 329, 333. Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr*, 912 F.2d 178, 181; *see also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which he finds more credible). Where there is a conflict between medical opinions, the ALJ may choose between those opinions but may not substitute his own lay opinion for that of the medical

23

professionals. *Davis v. Chater*, 952 F. Supp. 561, 566 (N.D. Ill. 1996)(Keys, M.J.). A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

The district court is limited to determining whether the ALJ's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Secretary of Health and Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992). This does not mean that the ALJ is entitled to unlimited judicial deference, however. In addition to relying on substantial evidence, the ALJ must articulate his analysis at some minimal level and state his reasons for accepting or rejecting "entire lines of evidence," although he need not evaluate in writing every piece of evidence in the record. *See Herron*, 19 F.3d at 333; *see also, Young v. Secretary of Health and Human Servs.*, 957 F.2d 386, 393 (7th Cir. 1992) (ALJ must articulate his reason for rejecting evidence "within reasonable limits" in order to allow for meaningful appellate review); *Guercio v. Shalala*, No. 93 C 323, 1994 WL 66102, at *9 (N.D. Ill. March 3, 1994)(Marovich, J.)(ALJ need not spell out every step in his reasoning, provided he has given sufficient direction that the full course of his decision may be discerned) (citing *Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir. 1988)).

## DISCUSSION

The ALJ's decision poses several problems that make remand necessary. The ALJ made no reference to the substantial proportion of medical evidence that was submitted after the administrative hearing, and he was not accurate in his references to evidence that was available prior to the hearing. The ALJ made contradictory findings about the nature and severity of Plaintiff's disability. The ALJ made no reference to testimony of the vocational expert that suggested Plaintiff

could not perform any jobs that exist in significant numbers in the economy. Instead, the ALJ cited selectively from the expert's testimony only the portion that suggested Plaintiff could perform some jobs. The ALJ failed to articulate sufficiently his basis for discounting Plaintiff's testimony as lacking credibility regarding Plaintiff's complaints of pain. The ALJ also was erroneous in his analysis of the reasons he did provide for his lack-of-credibility finding.

### 1. Failure To Discuss Evidence Fully and Accurately.

Plaintiff contends the ALJ disregarded significant portions of the medical treatment evidence that are relevant to the case. (Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem.") at 12-13.)[Dkt # 18.] Because the ALJ ignored relevant lines of evidence, Plaintiff argues, the case must be remanded to the Commissioner. (Pl.'s Mem. at 13, citing *Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir. 2000); *Schroeter v. Sullivan*, 977 F.2d 391, 395 (7th Cir. 1992).)

The ALJ failed to discuss a substantial portion of the medical evidence. He did not state whether he had a reason for disregarding this evidence, nor can it be determined whether he was intentionally disregarding the evidence as opposed to inadvertently overlooking it. It is not the court's role to weigh the evidence or make new findings of fact. *Herron*, 19 F.3d at 333. The Commissioner argues that although the ALJ "did not engage in a document-by-document recitation of the evidence," nevertheless "his decision contains an entirely accurate summary of the evidence," citing *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). (Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") at 7.) In *Green*, the court stated that a written evaluation by the ALJ of each piece of evidence is not required, however:

> in cases where the claimant presents considerable proof to counter the agency's position, the ALJ must articulate, at some minimal level, his analysis of the evidence. Only then may a reviewing court track the ALJ's reasoning and be assured that the

ALJ considered the important evidence.

*Id.* (citation omitted).

Plaintiff submitted more than 100 pages of evidence spanning five years of medical treatment. Arguably that evidence shows that Plaintiff's left hand and arm pain never significantly improved throughout the five years of treatment. Even the SSA's consulting physician, Dr. Shah, diagnosed "chronic pain" that not only persisted in spite of attempts at corrective surgery, but that actually may be "due to" those multiple surgeries. (R. 102.) In this case, where the ALJ gave the court no way to track his reasoning in analyzing that evidence and coming to his conclusion, the court has no authority to supply its own reasoning to resolve the matter. *O'Connor v. Sullivan*, 938 F.2d 70, 73 (7ᵗʰ Cir. 1991); *See also Tate v. Shalala*, No. 92 C 4995, 1994 WL 249533, at * 4 (N.D. Ill. June 7, 1994)(Nordberg, J.); *Sarchet v. Chater*, 78 F.3d 305, 307 (7ᵗʰ Cir. 1996); *Griffin v. Massanari*, No. 00 C 7109, 2001 WL 1064476, at * 10 (N.D. Ill. Sept. 13, 2001)(Schenkier, M.J.); *Phillips v. Massanari*, No. 00 C 3939, 2001 WL 936120, at * 11 (N.D. Ill. Aug 16, 2001)(Schenkier, M.J.).

In *O'Connor*, the claimant underwent a pulmonary function test that met the listed impairment and therefore should have qualified the claimant for benefits automatically under step three of the SSA's five-step analysis. The ALJ did not refer to this test result, but cited other evidence to conclude the claimant had only a "slight" pulmonary impairment. 938 F.2d at 72-73. The district court affirmed the ALJ, dismissing as harmless error the ALJ's failure to cite the positive test result, on the ground that in the court's view the medical record as a whole supported the ALJ's conclusion. *Id.* at 73. On appeal the Commissioner argued the pulmonary test was invalid, and therefore the trial court was correct in affirming the ALJ even if the ALJ did not discuss that

evidence. The Court of Appeals court did not accept that argument. The court noted that the ALJ nowhere said the test was invalid. The court held that, whether the ALJ overlooked the test completely or he balanced it against other evidence and discounted it without giving a reason for doing so, either way the ALJ was wrong, and the reviewing court could not rectify the ALJ's error by presuming to determine whether the test was invalid. *Id.*

Here the Commissioner argues that the ALJ's finding that Plaintiff was capable of performing light duty work with certain restrictions on the use of his left hand was "at least consistent with, if not more accommodative than" Dr. Kumar's opinion that Plaintiff could perform light work including lifting up to 15 pounds with his left hand, or Dr. Schenck's opinion that Plaintiff could return to his regular duty. (Def.'s Mem. at 8.) However, the ALJ did not state his interpretation of Dr. Kumar's or Dr. Schenck's opinions. The case must be remanded for the ALJ to evaluate the entire record of medical evidence.

## 2. Contradictory Findings.

The ALJ made inconsistent statements in regard to several critical matters. Such contradictory statements also necessitate remand. *See, e.g., Smith v. Massanari*, No. 00 C 7504, 2001 WL 936123, at * 2 (N.D. Ill. Aug. 16, 2001)(Shadur, J.)(remand on cross-motions where ALJ is inconsistent; neither movant is entitled to summary judgment where ALJ's inconsistency prevents the court from according each opposing party the most favorable factual scenario posed by the evidence, coupled with all reasonable inferences); *Sweeney v. Shalala*, No. 92 C 6664, 1993 WL 350200, at * 1 (N.D. Ill. Sept. 10, 1993)(Holderman, J.)(contradictory conclusions prevent the court from evaluating the ALJ's reasoning; such an incomplete resolution of the case requires remand); *Riels v. Bowen*, 85 C 9169, 1988 WL 53259, at * 2 (N.D. Ill. May 13, 1988)(Parsons, J.); *Harvey v.*

*Bowen*, 86 C 0730, 1986 WL 12011, at * 2 (N.D. Ill. Oct 17, 1986)(Plunkett, J.).

One inconsistency in the present case concerns the ALJ's determination that Plaintiff made an unsuccessful work attempt when he was employed briefly at Montgomery Wards in April, 1997. That finding appears inconsistent with the ALJ's determination that Plaintiff was able to work both as of the date of his December 1997 application for disability (as to SSI) and throughout the period since his initial injury in September 1993 (as to SSDB).

An "unsuccessful work attempt" ("UWA") occurs when a person is forced to stop working or restrict working because of the onset of an impairment, and more than 30 days after this change in work status the person attempts to return to work or to the former level of work but must discontinue this attempted return after a brief time because of the impairment. Social Security Ruling 84-25, 1984 WL 49799, at * 2 (SSA 1984). The SSA may not find that a claimant is capable of performing substantial gainful activity based on what amounts to an unsuccessful work attempt. *Id.*; *Thomas v. Sullivan*, No. 91 C 5488, 1992 WL 67817, at * 5, n.4 (N.D. Ill. Mar. 26, 1992)(Kocoras, J.)

Where the ALJ finds the claimant has made an unsuccessful work attempt, but goes on to pronounce the claimant capable of performing substantial gainful activity without explaining why this conclusion is warranted despite the UWA finding, the two determinations contradict one another. *Salinas v. Sullivan*, No. 91 C 2450, 1992 WL 51706, at * 2 (N.D. Ill. Mar. 9, 1992)(Holderman, J.).

In the present case the ALJ made such contradictory findings. He characterized Plaintiff's abortive Montgomery Wards job in April, 1997, as an unsuccessful work attempt. (R. 14.) Although the ALJ referred to Plaintiff's failure to hold this job as due to the fact that "*allegedly* he could not

28

do the work" (R. 14, emphasis added), by designating that effort as an unsuccessful work attempt the ALJ has made a finding that the work attempt indeed was unsuccessful because of Plaintiff's impairment. Thus, the ALJ must explain why Plaintiff is not impaired in October 1998, when in April 1997, he could continue the Montgomery Wards job because of his impairment. The ALJ did not explain that apparent contradiction. Accordingly, remand is necessary to allow the ALJ to articulate his reasoning.

Another apparent contradiction lies in the ALJ's evaluation of Plaintiff's credibility. (Pl.'s Mem. at 14.) The ALJ finds Plaintiff's "subjective complaints of functional limitations and allegations of pain are not fully credible, although his testimony at the hearing was generally credible." Plaintiff's testimony at the hearing necessarily was about his "subjective complaints of functional limitations and allegations of pain." For the ALJ to characterize this testimony both as "generally credible" and as "not fully credible" requires an explanation by the ALJ sufficient for the court to understand his reasoning. As discussed in a following section, the ALJ has failed to provide such an explanation. Remand is warranted to resolve this inconsistency also.

3. Vocational Expert's Opinion.

The ALJ posed two hypothetical questions to the vocational expert. In the first hypothetical, the ALJ asked essentially whether a person with Plaintiff's exertional restrictions on lifting and repetitive use of his left hand and arm could perform jobs of a type that existed in significant numbers in the local and national economy. The vocational expert opined that he could. (R. 297-98.) The ALJ then asked whether there would be such jobs locally or nationally that would accommodate not only Plaintiff's exertional restrictions, but also a need to take frequent work breaks, difficulty understanding and carrying out instructions, and inability to maintain attention and

concentration for extended periods because of chronic pain. The vocational expert opined there would not be any such jobs. (R. 299.)

The ALJ relied on the vocational expert's first opinion in his decision, but made no mention whatsoever of the vocational expert's second opinion. Nor did the ALJ refer in his decision to any of Plaintiff's hearing testimony that presumably prompted the ALJ to pose the second hypothetical. The second hypothetical apparently reflects Plaintiff's testimony that in the four hours or less that he was in class at Joliet Junior College each day, Plaintiff would have to leave the classroom as many as two to five times a day because of the pain and swelling in his left hand. (R. 275.) The second hypothetical also reflects Plaintiff's testimony that he could not take the codeine-based pain medicine Dr. Kumar prescribed to deal with these bouts of pain at school, because the medicine made Plaintiff drowsy and unable to concentrate in class. (R. 273-74.)

Plaintiff's counsel at the hearing commented that the ALJ's second hypothetical covered the very issues about which counsel himself intended to question the vocational expert. (R. 300.) The frequent need to take breaks from a job because of pain, and inability to counteract the pain with medication without the sacrifice of ability to concentrate, understand instructions, and maintain adequate attention and pace of work, were important parts of Plaintiff's claim. Having referred to these factors at the hearing, the ALJ made no comment on them in his written decision. The Court cannot determine whether the ALJ concluded that Plaintiff's testimony about taking breaks from class and being unable to take pain medication while in class was part of what the ALJ characterized as "not fully credible" testimony, or whether the ALJ overlooked the second hypothetical and the expert's response to it. In either case, the ALJ's selective discussion of only the expert testimony that supported a finding of not disabled was inappropriate and necessitates remand. *Sweeney v.*

*Shalala*, 1993 WL 350200, at * 1.

4. Credibility Finding.

Plaintiff contends the ALJ did not merely discount Plaintiff's complaints of pain, but disregarded these pain complaints entirely by concluding Plaintiff had no non-exertional impairments, contrary to the regulations, which require the ALJ to consider all reported symptoms, including pain. 20 C.F.R. § 404.1529(a). (Pl.'s Mem. at 13-14; Pl.'s Reply at 8 [Dkt # 27].) Alternatively, Plaintiff argues that the ALJ failed to provide a sufficient explanation of his reasons for discounting pain to allow the court to make an informed review of this decision. (Pl.'s Mem. at 14, citing *Herron*, 19 F.3d at 335-36.)

The Commissioner responds that the ALJ's credibility finding was "adequately articulated," though the Commissioner does not cite to any specific statement by the ALJ. (Def.'s Mem. at 8.) Instead, the Commissioner contends the "opinion of Plaintiff's treating physician and the medical evidence as a whole supports the ALJ's conclusion that, despite the limitations caused by his impairment, Plaintiff could perform a significant number of jobs." (Def.'s Mem. at 9.) The Commissioner then cites various aspects of the evidence that purportedly support the ALJ's conclusion. (Def.'s Mem. at 9-10.)

The Commissioner correctly notes the ALJ is entitled to substantial deference regarding his credibility finding, and the Court should not disturb that finding unless it is "patently wrong." (Def.'s Mem. at 8, citing *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995).) However, where the ALJ discounts plaintiff's subjective complaints in denying disability, it is the ALJ's responsibility to build an accurate and logical bridge from the facts to the conclusion the ALJ draws from those facts. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

Here the ALJ failed to build a logical bridge. The ALJ cited SSR 96-7p as providing the format for analyzing the credibility of plaintiff's subjective complaints. (R. 16.) However, the ALJ failed to follow this format properly. SSR 96-7p instructs the ALJ to consider the following factors in evaluating plaintiff's subjective complaints of pain or other symptoms: 1) plaintiff's activities of daily living; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) factors that precipitate or aggravate the symptoms; 4) what medications plaintiff takes to alleviate pain or other symptoms, in what dosage, and with what effectiveness and side effects; 5) what treatment, other than medication, plaintiff undergoes or has undergone to alleviate pain or other symptoms; 6) measures other than treatment plaintiff uses or has used to relieve pain or other symptoms (*e.g.*, lying flat on his back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7) other factors concerning plaintiff's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p further requires the ALJ to provide "specific reasons for the finding on credibility, supported by the evidence in the case record." *Zurawski*, 245 F.3d at 887, *quoting* SSR 96-7p. The ALJ's explanation for discounting the plaintiff's subjective complaints must be "sufficiently specific to make clear to [plaintiff] and to any subsequent reviewers the weight the adjudicator gave to [plaintiff's] statements and the reasons for that weight." *Id.*

Here, the ALJ cited three reasons for discounting Plaintiff's pain complaints. First, the ALJ noted that Plaintiff takes Tylenol with codeine for his residual pain. (R. 16.) However, the ALJ makes no evaluation of how effective this medicine is, or what side-effects it may have, contrary to the requirement of factor five of SSR 96-7p. Plaintiff testified the Tylenol with codeine only relieved his pain "a little bit," and that its side-effects of drowsiness and poor concentration were such that Plaintiff did not take the medicine when presumably he needed it most, to enable him to

32

continue in the classroom. (R. 273-74.) The ALJ also failed to discuss factor six of SSR 96-7p regarding other measures Plaintiff takes besides medication to deal with his pain. Plaintiff's testimony was that he would leave his classroom two to five times a day to soak his hand in cold water and hold it above his head to relieve the swelling and pain. (R. 275, 278.) The ALJ makes no reference to this conduct. He does not explain why or if he concluded that Plaintiff's testimony about having to leave the classroom was not credible. Thus, the ALJ's first basis for discounting Plaintiff's pain complaint is inadequately analyzed.

Second, the ALJ found Plaintiff's pain complaints lacked credibility because Plaintiff was attending college, "doing well," and "should be able to obtain competitive employment" when he completed his studies. (R. 16.) However, the regulations make clear that the SSA may not consider school attendance as substantial gainful activity. 20 C.F.R. § 404.1572. Thus, it is questionable whether school attendance can be used as proof that the claimant is capable of performing substantial gainful activity in spite of a previous unsuccessful work attempt. In referring to Plaintiff's school attendance, the ALJ made no mention of Plaintiff's testimony that he had to leave the classroom two to five times in a four-hour period because of his pain. Nor did the ALJ note that the vocational expert concluded there would be no jobs Plaintiff could perform if he found it necessary to, in effect, take as many breaks from his work station as he did from his classroom desk. Nor did the ALJ note that Plaintiff was at school for, at most, four hours a day. The ability to sit in a classroom for up to four hours cannot be regarded as the equivalent of being able to work a full-time job. *Cohen v. Sec. Dept. of H.H.S.*, 964 F.2d 524, 530 (6th Cir. 1992)(seven or eight class hours in a day are not the same as working). As the Sixth Circuit noted in *Cohen*, the ALJ must evaluate the claimant's residual functional capacity "'for work activity *on a regular and continuing basis*.'" *Id.* (emphasis

33

in original, citing 20 C.F.R. § 404.1545(b).) The ALJ's reference to Plaintiff's school attendance does not reflect consideration of how Plaintiff could carry over the special accommodations and comparatively short hours of his school program into a competitive working environment. In this case, the ALJ did not demonstrate a logical bridge extending from the fact Plaintiff attends school to the conclusion that Plaintiff lacks credibility regarding the extent of his pain. *See Gibson-Jones v. Apfel*, 995 F. Supp. 825, 826 (N.D. Ill. 1998)(Bucklo, J.).

Third, the ALJ discounted Plaintiff's credibility purportedly because of the discrepancy between what Plaintiff reported on an initial application form and what he subsequently told Dr. Shah about his ability to perform ordinary tasks of daily living such as turning a doorknob, buttoning his shirt, and holding a cup. On the application form, which appears from the handwriting to have been filled out by someone else on Plaintiff's behalf, Plaintiff reported that he does no household chores, recreational activities, or automobile driving. (R. 48.) The ALJ characterizes this as a claim by Plaintiff that he is "*incapable* of performing any daily living tasks." (R. 16, emphasis added.) The questions on the form to which the ALJ refers ask only what the applicant *does*, not what he claims he is *capable* or *incapable* of doing. Thus, reporting that he does no household chores or similar activities does not contradict Plaintiff's later comments to Dr. Shah that he can use his right hand to open a door or button his shirt.

Moreover, Plaintiff correctly cites *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000), for the proposition that the ability to perform these minor activities of daily living does not suffice to demonstrate Plaintiff can perform more substantial work activities. (Pl.'s Mem. at 14.) Hence even though the activities of daily living is the first factor listed for consideration in evaluating the credibility of subjective pain complaints under SSR 96-7p, there is no logical bridge connecting

Plaintiff's ability to turn a doorknob or button his shirt to the conclusion Plaintiff is able to handle the demands of regular work.

The ALJ failed to justify his determination that Plaintiff's subjective pain complaints are not credible. The case must be remanded for further analysis of this and the other matters mentioned.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is DENIED, and Plaintiff's motion for summary judgment is GRANTED. Plaintiff's request for remand is GRANTED and the case is REMANDED to the Commissioner for further proceedings consistent with this opinion and order.

**IT IS SO ORDERED.**

**GERALDINE SOAT BROWN**
**United States Magistrate Judge**

**DATED:** July 9, 2002